

**ATTORNEY FOR APPELLANT**

Glen E. Koch
Boren Oliver & Coffey, LLP
Martinsville, Indiana

**ATTORNEYS FOR APPELLEE**

Gregory F. Zoeller
Attorney General of Indiana

Monika Prekopa Talbot
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Jared Allen Mynatt,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff.*

August 28, 2015

Court of Appeals Cause No.
55A05-1501-CR-41

Appeal from the Morgan Superior
Court

The Honorable Christopher L.
Burnham, Judge

Cause No. 55D02-1408-FB-1224

**Riley, Judge.**

## STATEMENT OF THE CASE

Appellant-Defendant, Jared Mynatt (Mynatt), appeals his conviction for aiding inducing or causing armed robbery, a Class B felony, Ind. Code §§ 35-41-2-4; -42-5-1 (2013).

We affirm.

## ISSUE

Mynatt raises one issue on appeal, which we restate as: Whether the trial court abused its discretion in denying Mynatt's request for counsel during trial.

## FACTS AND PROCEDURAL HISTORY

On January 28, 2014, Mynatt, Jamie Hicks (Hicks)—who was Mynatt's girlfriend—and Justin Cherry (Cherry) all drove in Hicks' car from Indianapolis to Mooresville, Indiana. In Mooresville, they stopped at some apartments located behind a Marathon gas station. At some point, Hicks exited the vehicle to use the Marathon's restroom. Mynatt accompanied her. Toni Wilson (Wilson) was the clerk that day. Because the restroom was for employees only, Hicks stated that she was pregnant and she needed to use it. At first, Wilson informed Hicks that she could not use the restroom but she then changed her mind. While Hicks was in the restroom, Mynatt waited by the door. When both returned to the vehicle, Cherry exited the vehicle and entered the gas station. Cherry obtained a two-litter drink from the back of the store and then approached Wilson for two packs of cigarettes. When Wilson asked Cherry for his identification, Cherry stated that he "was not going to need it today."

(Transcript p. 128). Cherry then pulled out a gun and ordered Wilson to open the register and give him all the money. A nervous Wilson complied, and Cherry ran out of the store. When Cherry returned to the car, he jumped into the backseat and Mynatt sped off. After Cherry left, Wilson locked the door and called her employer, who in turn called the police. Cherry was arrested in connection with an Indianapolis robbery in February 2014 and he was later identified as a suspect in the instant case. The police later learned of Hicks' and Mynatt's involvement and identified them from Marathon's security footage. In August of 2014, the police arrested Mynatt.

[5] On August 14, 2014, the State filed an Information, charging Mynatt with a Class B felony aiding, inducing or causing armed robbery. During Mynatt's initial hearing on September 2, 2014, he indicated that he would be proceeding *pro se*. Three days later, Mynatt filed a motion for a speedy trial. On November 3, 2014, Mynatt filed a written objection to a trial setting that was outside the seventy-day period. The trial court issued an entry citing court congestion and set the trial date for December 16, 2014. Shortly before Mynatt's trial, at the pretrial hearing scheduled on December 1, 2014, the trial court advised Mynatt that he had been charged with a Class B felony and that, if found guilty, he would face anywhere from six to twenty years in prison. Mynatt still indicated that he wanted to proceed *pro se* and that he understood the penalty. Mynatt added that on a prior occasion, he had been "involved in some B felony robberies in Marion County" and that he successfully defended all Counts which led to a dismissal. (Tr. p. 8). Mynatt also informed the trial court that he

was not worried about picking a jury for his trial, and in any event, "the most they can give me is twenty. They didn't even file a habitual on me. I'm happy with that. I go to the joint, I get maxed out, [and] that's ten. I go to the joint, I get a time cut, [and] I'll be out in six. I can live with that." (Tr. p. 8). The trial court then informed Mynatt that it was important for him to understand the rules of evidence prior to trial. The trial court further explained to Mynatt the contents of the pretrial order and the jury selection process. In addition, the trial court went through the names of the State's witnesses and asked Mynatt if he wanted to add his own witnesses. Mynatt indicated that he would only question the State's witnesses. Mynatt again confirmed that he wanted to represent himself.

[6] Mynatt's jury trial was held on December 16-17, 2014. At the start of trial, the trial court asked Mynatt if he had any questions regarding jury selection. Mynatt stated that he did not. The trial court, however, proceeded to explain the jury selection process, and after the jury was empaneled, Mynatt made an opening statement. During Hicks' cross-examination, Mynatt asked her whether she had sexual relations with Cherry, to which the State objected. However, the trial court allowed the question, and Hicks answered in the negative. Mynatt then asked more questions, such as whether they stopped at Hicks' parents' home on the way to Mooresville and whether Hicks asked the men where they were going. On all questions, Hicks answered in the negative. Frustrated by her answers, Mynatt blurted out, "Your honor, I am lost. I don't know how to do this. I know she is lying." (Tr. p. 7). The trial court explained

to Mynatt that if he had something to present that would contradict Hicks' testimony, he would have to wait for his time to present it under oath. After Hicks was excused from the witness stand, Myatt stated, "Your honor, I want to stop this. I need counsel." (Tr. p. 165). The trial court then excused the jury from the court room and the following dialogue ensued:

> Mynatt: I guess I need counsel. I mean I can't ask what I want to ask . . .
> Court: [] Mynatt, if you recall, we had this discussion about you representing yourself many times. And I told you what the danger was of doing so . . .
>
> Mynatt: Yeah, Well I . . .
>
> Court: Listen to me. All right, you listen to me now, okay? You adamantly told me that you didn't want counsel. You wanted to represent yourself. You know how to do it. You had no problems doing it. Fine. That is your right. You choose that right and go forward to a trial and you cannot stop the trial midstream and say I want counsel now. Yes, you are not very good at asking questions because you don't understand the rules of evidence. I told you that. But, you made your conscious decision to proceed without an attorney, and I am not going to stop this trial.
>
> Mynatt: Can I get co-counsel?
>
> Court: I'm not going to ask some attorney to walk in the middle of a trial and try and help you.
>
> (Tr. pp. 166-67).

After the jury returned to the court room, the trial resumed. At the close of the evidence, the jury found Mynatt guilty as charged. On January 21, 2015, the trial court sentenced Mynatt to twenty years in the Department of Correction.

Mynatt now appeals. Additional information will be provided as necessary.

## DISCUSSION AND DECISION

"The Sixth Amendment right to counsel applies to the states via the Due Process Clause of the Fourteenth Amendment . . . and guarantees the assistance of counsel at critical stages of prosecution up through trial, sentencing, and various post-trial matters." *Mosley v. State*, 908 N.E.2d 599, 604 (Ind. 2009). "Correlative to the constitutional right to counsel is the right of a defendant in a criminal proceeding to appear *pro se*." *Koehler v. State*, 499 N.E.2d 196, 198 (Ind. 1986). The defendant "must be free personally to decide whether in his particular case counsel is to his advantage." *Id*. (citing *Faretta v. California*, 422 U.S. 806, 835 (1975)).

In *Koehler*, our supreme court held that where a defendant seeks to abandon a *pro se* defense and reassert the right to counsel, "[r]elevant factors must be considered by the trial court in order for it to exercise a meaningful discretion in ruling on defendant's request to change from self-representation to counsel-representation." *Id*. at 199.

> Relevant factors should include, among others, the following: (1) defendant's prior history in the substitution of counsel and in the desire to change from self-representation to counsel-representation; (2) the reasons set forth for the request; (3) the

length and stage of the trial proceedings; (4) disruption or delay which reasonably might be expected to ensue from the granting of such motion; and (5) the likelihood of defendant's effectiveness in defending against the charges if required to continue to act as his own attorney.

*Henley v. State,* 881 N.E.2d 639, 645 (Ind. 2008) (citing *Koehler*, 499 N.E.2d at 199). Mynatt argues that an analysis of the *Koehler* factors reveals that the trial court should have granted his request for appointment of counsel. We will review each of the *Koehler* factors in turn.

[11] Turning to the first factor, Mynatt's prior history in the substitution of counsel and in the desire to change from self-representation to counsel-representation, the facts speak for themselves. Mynatt made the decision to proceed *pro se* at the beginning of his case and did not change his mind until mid-trial. During his initial pretrial hearing, the trial court informed Mynatt that if found guilty of the charged offense, he would face six to twenty years in prison and a fine up to $10,000. Mynatt informed the trial court that he understood the penalty involved. Mynatt also indicated that he had successfully defended himself against ten felony robbery charges which were dismissed for lack of evidence. He also indicated that he was not worried about picking out a jury. Furthermore, Mynatt stated that the worst sentence he could receive was twenty years, which meant that he would serve a maximum of ten years, and with good behavior, he would be out in six years. When asked whether he understood the rules of evidence, Mynatt stated "I can comprehend the

paperwork I'm getting sent []." (Tr. p. 9). From the foregoing facts, we find that this first *Koehler* factor weighs against the appointment of counsel.

[12]  With regards to the second factor, the reasons set forth for the request, we note that Mynatt's reason for requesting counsel representation mid-trial happened during Hicks' cross examination where Mynatt believed that Hicks was lying and he did not know how to impeach her. At that point, Mynatt informed the trial court that he needed a lawyer. This was the first time he had indicated that he wanted to change from self-representation to counsel-representation, and Mynatt had not previously made requests for substitution of counsel. Hicks was the second State witness and the record shows that his performance prior to this stage of the trial had been effective. Moreover, Mynatt had expressed confidence that he would effectively represent himself without the assistance of counsel. In light of the foregoing, we find that this second *Koehler* factor weighs against the trial court appointing counsel.

[13]  On the third factor, the length and stage of the trial proceedings, the trial was midstream. The trial court stated that it did not want to appoint a counsel halfway through trial. A jury had been picked, opening statements had been made, and Mynatt was in the process of cross-examining the State's second witness—Hicks. Similarly, we find that this factor weighs against appointment of counsel.

[14]  As with the fourth factor, disruption or delay which reasonably might be expected to ensue from the granting of such motion, we agree with the State

that allowing counsel to intervene mid-trial would have caused a delay. A continuance would have been necessary for counsel to become familiar with the case. (Compare with *Koehler*, 499 N.E.2d at 199, where defendant had standby counsel and no continuance would have been necessary because standby counsel was familiar with the case). In this regard, we find that this factor weighs against appointment of counsel.

[15] Finally, with regards to the fifth *Koehler* factor, the likelihood of defendant's effectiveness in defending against the charges if required to continue to act as his own attorney, Mynatt claims to have previously represented himself successfully against ten felony Counts. Also, Mynatt had indicated that he had a college education and was familiar with the legal system. Mynatt also knew the penalty of his charged offense and how many years he would serve if convicted.

[16] Applying the *Koehler* factors to the case at bar, and weighing them against each other, we conclude that the trial court did not abuse its discretion in denying Mynatt's request for counsel. When a defendant elects self-representation, the trial court must elicit a knowing, intelligent, and voluntary waiver of the right to counsel. *McKeown v. State*, 556 N.E.2d 3, 6 (Ind. Ct. App. 1990), *reh'g denied, trans. denied*. The trial court must also establish a record demonstrating that the defendant was made aware of the nature, extent, and importance of the right to counsel and the dangers and disadvantages of waiving it. *Id*.

Here, Mynatt was advised at his pretrial hearing about the dangers of proceeding *pro se*. Even in light of these warnings, Mynatt was confident that he would successfully defend himself without the assistance of counsel. Mynatt stated that he had managed to have ten felony Counts dismissed for lack of evidence. Mynatt was also not concerned about picking out a jury or serving prison time if found guilty. Moreover, a continuance would have been imminent to enable the newly appointed counsel to become familiar with the case. As such, our analysis of the *Koehler* factors, in conjunction with Mynatt's expression that he would adequately represent himself, leads us to conclude that the trial court did not violate Mynatt's Sixth Amendment right to counsel.

## CONCLUSION

Based on the foregoing, we conclude that the trial court did not abuse its discretion by failing to appoint counsel for Mynatt.

Affirmed.

Friedlander, J. and Brown, J. concur